Council, first, on behalf of the panel, thank you for modifying this to a remote process. We thought it would be a lot easier for everyone concerned in light of the difficulties with weather and travel earlier this week, so thank you for that. We'll call the first case, and the only case for this morning is In Re Avandia Marketing, appellate number 25-2278. Council, before you begin, on each side, there's no timer, so I'll give you, someone's going to communicate to me when we get to the two-minute mark and when time has expired, so I'll just jump in and do that for your edification, subject to my colleagues having additional questions. Okay. Ms. Allen, we'll hear from you. Thank you. Good morning, and I'd like to reserve three minutes for rebuttal. That'll be granted. May it please the court, Devorah Allen on behalf of GSK. The district court held that the plaintiffs had two methods of proving reliance using common evidence. On appeal, the plaintiffs abandoned both of the grounds for the district court's ruling. They say that the district court didn't really mean reliance could be inferred for all doctors, and they say that they're not relying on the internal GSK marketing analyses to prove causation. Instead, they tried to recast the class certification order as resting on the narrower inference that the entire decline in Avandia sales after the release of the Nissen study was attributable to the end of the alleged fraud. Now, that theory of causation has no support in the district court decision. District court decision doesn't even mention Nissen, and in fact, as the district court noted, the district court excluded the only expert they had on causation. That's joint appendix 16, note 64. The problem- The district court may never mention the Nissen study at all? That's right, your honor. The class certification decision does not mention the Nissen study. It was not the basis for certifying a class. The district court accepted the argument that the plaintiffs made in their class certification papers, which was that the district court could grant an inference that all prescriptions were written in reliance on the fraud. At the argument, they raised the Nissen theory, the district court considered it, and then rejected it, I think, implicitly because they didn't have an expert on causation. That's what the district court said at note 64. She said that there was an attempt to suggest that Dr. McGuire could give expert analysis bearing on causation. He hadn't been offered as an expert on causation. He was offered as an expert on injury and damages. His causation analysis, therefore, was not subjected to Daubert. And so she said she wasn't going to permit it. And I think for that- She wasn't going to permit it for now. Didn't she end up, footnote 64, I don't have it right in front of me, but I thought she said she wasn't going to permit it now. She declined to consider it for the purposes of class certification. Now. Didn't she use the word now? I'm asking. I don't want to misrepresent to the court. She said, yes, the court will decline to consider his analysis for that purpose now. That's what she said. And I think the issue for the plaintiffs is that they need an expert if they want to pursue this Nissen theory. They suggest on appeal that they can essentially go forward without an expert, that they can show a jury the chart of the decline in sales after the release of Nissen, and a jury can just figure out that 63 percent of sales must have been, or prescriptions, must have been made in reliance on the fraud. But as this court recognized in the Slutowski decision- Counsel, I believe Judge Schwartz is trying to ask you a question. Oh, I'm sorry, Your Honor. Thank you, Judge. Counsel, what I'm asking is, why can't a jury be asked to make that inference, and why can't the defendant offer contrary evidence to the jury for them to say the cause of the sales decline was something other than the disclosure that information that GSK had since 2005 about the cardiac consequences of the drug has an impact? Why isn't this just a jury question? So there are two reasons the plaintiffs can't do it. The first is that they need an expert to do it. This court said in Slutowski- Why? Why do they need an expert to do it? Because the analysis is technical and it is not within the province of a jury. And it depends on the way they get to 63 percent is they look at the nine quarters after Nissen. Well, why nine quarters? Dr. McGuire picked nine quarters because that was the class period. But if you're going to a jury and telling them we're talking about causation, you need an explanation for why are all the prescriptions after Nissen for the first nine quarters written in reliance on the fraud and none of the prescriptions after the nine quarters? You would need an expert to explain that. You need an expert to- Why? That's just the close of the class period. Why do you need an expert to explain that? Well, it makes sense for the class period when you're talking about damages. But when you're talking about causation, what they are saying is that this is a proxy for the effect of the alleged fraud on doctors prescribing decisions. So why is it that for the first nine quarters, we're going to say all of the decline, all of the prescriptions were written in reliance on the fraud and they stopped. After nine quarters, those are no longer written in reliance on the fraud. There may be a theory that can support that. I'm not passing judgment on whether or not there is, but the plaintiffs don't have one. But then I think more fundamentally to answer, you know, the second part of your question, even if they had an expert, I don't think this analysis meets their burden on causation because it doesn't control for the other factors that contributed to the decline. The Second Circuit explained in a sergeant's decision that a plaintiff can't just look at a decline in sales after an alleged disclosure and assume that that whole decline is attributable to the safety risks because there are other factors that influence prescription decisions. And what the plaintiffs need is an analysis that parses out those factors. Now, the plaintiffs had that. They had a regression from Dr. Rosenthal. It was excluded on Daubert. And so they don't have the sort of causal analysis that the Second Circuit has made clear that they need in analogous cases. And that would be necessary to say, OK, doctors stopped prescribing Avandia. What percentage was due to the alleged fraud and what percentage was due to totally unrelated factors? But are you saying that for any court to certify a circumstance like this, a regression analysis is required? If a plaintiff doesn't produce it, they cannot prevail. Is that your position? What I'm saying is if they want to rely on aggregate evidence of reliance, then they need to isolate the effect of the alleged fraud. One mechanism for doing that is a regression. I'm not saying there are not other ways to do that. The regression, I think, is the most common one that we see in Arantan and in Painters and in Sargents. So that's the First Circuit, the Second Circuit, and the Ninth Circuit. They have all accepted regressions as being appropriate for this. Could there be another tool? There might be. But could they use, like, for example, representative samples like in the Tyson case? Yeah. Yeah, I'm not. Yes, Your Honor, I'm not ruling out the possibility of aggregate evidence writ large. But I think the important thing is it has to somehow control for these confounding variables. That's what a regression does. It says we have multiple things going on at the same time. Nissen happened and doctors are stopping prescriptions. But other things are going on. The number of diabetes diagnoses is going down. And so if we want to know what was caused by Nissen and what was caused by other factors, a regression is a tool that allows us to do that. We're looking at predominance. Is there a predominant question? Is there a common question that can be resolved by predominant? Sorry. Is there a predominant question that can be reviewed, resolved by common evidence? You're speaking of evidence that would refute the plaintiff's burden. This sounds no different than a typical tort case that has a causation requirement, where the plaintiff proffers evidence that says it was caused by X. And the defendant comes forward and says, no, no, no, it was actually caused by Y. You're asking a different type of requirement simply because of the nature of the case. And you're using this phrase aggregate evidence. And I don't quite understand how that fits in. So I have two questions for you. What is the magic of the words aggregate evidence? And why is this different than any other tort type case, where causation is proved up by the plaintiff and the defendant says, no, it's mistaken, and it's up to the jury to decide what the cause is? So, Your Honor, I don't think there's any magic to aggregate, to the use of aggregate. So if you imagine a non-class setting, and you have one individual insurer who wants to prove reliance, theoretically, that individual insurer could just have the doctors come in and testify, the doctors who reimburse prescriptions for its patient. And the doctors could say, I wrote those prescriptions in reliance on the alleged fraud. That would be a viable mechanism. They can't do that in the class setting, which is why they move to aggregate evidence. But the burden of proof, I don't think, is any different. And then the second- But in the class setting, what could they do if it went to trial? They can use a statistical tool like a regression. And a regression allows them to say, in aggregate, this quantity of prescriptions was written in reliance on the fraud. It sure sounds like you're awfully close to saying, you must have an expert in all cases like this. Your Honor, I think that I have not seen a case of this nature that was certified without expert analysis at all. Even like in painters and sergeants, there was expert analysis. And I do think that a regression is the most commonly used tool. So, if we have this footnote, 64, that says that McGuire isn't being considered now, and we have McGuire pointing to the Neeson analysis, if we agreed with you, let's say, that the current basis that the district court gave for finding predominance was insufficient, why is the best course of action for us to remand, for the court to actually consider all the evidence that was in place, including the McGuire analysis? Before you answer, you have two minutes. Thank you. The court did consider the Neeson analysis. The plaintiffs raised it at the hearing. Their responsive brief has multiple sites to where they raised this argument. Are you saying in footnote 64, that says I'm not considering this now? Yeah, I'm saying, yes. I'm saying that I believe the district court, the reason the district court rejected the Neeson analysis is because the district court wasn't going to allow them to use Dr. McGuire after the fact to backhole an evidentiary hole that they had when their real causation expert, Dr. Rosenthal was excluded. They knew they needed a regression and they offered Dr. Rosenthal for that purpose. Her model was excluded because it was results oriented and generated false positives. But that doesn't mean that they should be allowed to swap in another expert who never offered that opinion and never had that sort of opinion survive Dalbert. And that's what the district court acknowledged in its decision. And so I think that, I don't think remand is necessary. I think that this court can consider and reject Neeson for the same reason that the district court did. I'm guessing, and again, based on that footnote, that if it were to come back to Judge Roof, she would be willing to consider additional evidence, both by the other side and by you. And specifically, possibly the McGuire evidence and anything else that may come, wish to come in, provided you have a chance to try to rebut that at summary judgment. And we've certainly done that in the past. We've done it in, I guess, a Vandia one in 2014, and we've done it in the Marcus case. Which was the run-flat-tires case from 2012. Certainly, certainly the court, you know, obviously has within its authority to send it back to the district court. We went through, as this court knows, years and years of discovery. This is not a new case. This case has been going on for a long time. The plaintiffs had years to prove up their case. They did it. They tried to do it with Dr. Rosenthal. Dr. McGuire testified, this is joint appendix 2939. I do not study causation. He said that in black and white. And so the district court held them to that. And, you know, I take your point. I can't, I can't, I'm not sure what Judge Roof would do if she would let them have a redo. But we certainly think they had their chance to offer a theory of causation that could survive Daubert and be common evidence. And they failed to do that. And so I'm not sure why they should get a second bite at the apple now. Inspired. I'm just going to ask my colleagues if they have any additional questions for you before we let you go. Judge Montgomery Reeves. No, thank you. Judge Ambrose.  Okay. All right, Miss Allen, we'll see you back on rebuttal. Thank you, Your Honor. You bet. And if my voice sounds raised, it's because people were having trouble hearing me. I'm not yelling at you. May I proceed, Your Honor? Yes, please. Good morning, and may it please the court. Tom Sobel for the plaintiffs and the certified class. I think that GSK makes two misdirections regarding the District Court's class certification ruling, both in its papers and here today. The first one is that the class certification ruling needs to be read in tandem with the Daubert rulings. Let me ask you a question about that, counsel. I almost read your papers and hear you saying that we should sort of incorporate the reasoning of the Daubert opinion into the class certification opinion. But I don't see where the District Court did that. And you're talking about two different standards. Does it make sense for us to incorporate that opinion if the District Court didn't do that? So the District Court did do so in the following ways, Your Honor, and I think there's three or four ways that will answer your question. First, the certification decision says and refers to the Daubert rulings as a necessary prelude to certification, JA3. Second, the class certification ruling explicitly changes the class definition to reflect the McGuire estimates and time period of January 2005 through the middle of 2007. So the conclusion of the Daubert ruling is explicitly changed in the class definition. Third, the District Court explicitly referred to Dr. McGuire's step-down models as being admissible. That's at JA9 in note 76, meaning that the District Court explicitly referred to that. And two pages after footnote 64, the District Court then explicitly refers to Dr. McGuire's opinions and testimony as being admissible on the issue of both one injury and two damages. Therefore, the correct way to interpret what Judge Roof was doing is 64 is talking about that Dr. McGuire is not being used for the purposes of, quote, reliance, end quote, meaning physician decision-making. However, because two pages later, she explicitly refers to Dr. McGuire's step-down model as giving her clear proof that all or substantially all third-party payers paid for some amount of fewer Evandia prescriptions during the class period means that, from my point of view, it is only doing a disservice to Judge Roof to even suggest that she has done anything other than incorporate the Daubert ruling into her class certification ruling. I just want to make sure I understand something. When you refer to the NISA natural experiment, you're just talking about Dr. McGuire's step-down analysis. Is that right? Well, yes, because Dr. McGuire is estimating injury and then estimates damages also from the fact that the natural experiment is, to what extent would doctors stop prescribing Evandia if they know that Evandia poses an increased risk of serious adverse events, serious ischemic adverse events? Do you agree with your friends on the other side that to prove this, you have to have an expert? We don't think we have to have an expert, but we have five that are left. I think that GSK leaves that out of both its papers and its argument here today. So let's be clear. In the Daubert rulings and also in the class certification decision, the court is basically saying that we have to prove two facts and that we have substantial evidence for. One fact is that the release of ICT 37, GSK's internal analysis, was substantially the same as the NISN results. We have plenty of expert testimony on that from Dr. Perry and Dr. Faruqi. So we have experts who are saying these two studies are the same. Second fact that we have to prove is that GSK, if it had released the study earlier, you would have seen a similar kind of decline. And there we have, again, expert testimony saying, well, wait a second. These are serious risks. The analyses are the same. Therefore, you're going to see a similar kind of response by the physicians. So really, there are both- Expert counsel, who is your expert for that point? Which one now that we don't have Dr. Rosenthal? Sure. There are two medical experts, Dr. Perry and Dr. Faruqi, who testify and support Judge Roof's determination at the Daubert stage that ICT 37 and the NISN study are the same and that GSK could have released the ICT 37 study earlier. Those are Drs. Faruqi and Dr. Perry. But that doesn't take us to the step beyond that, which is, and had that information been released, the amount of prescriptions would have dropped in 2005. By this amount. Correct. And for that, we rely upon the following items. And there are eight of them, but I'll just rattle it off quickly. First, it is relevant that the two studies are substantially the same. Second, that the studies were alarming, meaning that these were results that were showing its significant increased risk for serious adverse events, meaning heart attack or death. Third, there is overwhelming circumstantial evidence in this case, and at least the following categories, that the cardiovascular risk is inherent for diabetics. There was an emphasis by GSK's pre-NISN release study of marketing put on Avandia for its safety. And that was the context. There's also plenty of evidence that GSK itself was internally recognizing that its marketing for safer Avandia for the heart was, in fact, being heard by the providers. There we have also the severity of the ultimate risks that were disclosed. And we also have, by the way, the absence of any other plausible explanation. Well, your friends on the other side say, oh, the number of people being diagnosed with diabetes has gone down. And they say, if you look to Rosenthal, even Rosenthal didn't assume the entirety of the drop is because of the disclosure of this information. So I'm trying to figure out if I'm drafting an opinion that doesn't rely on Rosenthal, and I have to write a section that says, I look to this, I want to know what the this is to tell me that this percentage of the drop is due to the release of the true information about Avandia. What is the this in my sentence? Okay. Well, first, what I say, the this in the sentence is, and this is supported by the record, there is no other plausible explanation in the record anywhere. The comment made by counsel for GSK in the opening statement that diabetic prescriptions were going down is the first time in the 16-year history of this case that that suggestion has ever been made. It is nowhere in the record. There is, in fact, a drop that occurs. And then what there is also is there is the testimony of Dr. Maguire, who opines that on injury and damage that all or virtually all third-party payers would have paid for fewer prescriptions. There's also, by the way, the absence of a single physician who testifies anywhere here that in the wake of Nissen, they stopped prescribing Avandia for some other reason. In other words, it's just absolutely empty from the record. I thought the Rosenthal report said that there was no evidence that almost 60 percent, there was evidence that almost 60 percent of doctors would continue to prescribe Avandia. Yeah. So there's a misunderstanding in the papers by GSK and also their representations to hear about what Dr. Rosenthal's conclusion actually means. And I think it's important to understand this, Your Honor. What Dr. Maguire was doing is she was comparing a portion of GSK's promotion occurring from January 2005 to the middle of 2007. And she looked at that promotion and that only that piece of the promotion to determine what part, how much did that piece of the promotion cause by way of increased prescribing for Avandia. Now, she indicates in her report at. Sorry. She indicates in her report, if you go to 4239, 4279 and note 152, she says, but if I had been asked or I'm asked to talk about all of GSK's promotion back from 1999 to 2007, meaning I'm include another five years of their promotion, my results are going to be markedly the same. So the fact of the matter is, Your Honor, is that Dr. Maguire, Dr. Rosenthal looked at three confounding factors, potentially confounding factors. Promotion, the cost of promotion, changes in price and the potential that there might be a change in diabetic prevalence. The reality was that there wasn't any change in diabetic preference. The prices weren't really changing the same and that there was the potential for changes of promotion. The real reason why it is that Dr. Maguire, Dr. Rosenthal did not find more cause was because she had been instructed not to consider all of the five years of advertising that GSK had engaged in from 99 to 2005. Let me add, actually, this bonds a couple of questions. First of all, just generally, why did you pursue a quantity effect theory that is added prescriptions, in this case, to the exclusion of a price effect theory? Because they were charging a premium, were they not? They were charging a premium. And the reason we did that is that, frankly, the courts are mixed on whether there's a price theory can ultimately succeed on a class-wide basis. They often have those difficulties. For instance, in Harnish, this court, several years ago, had price issues there. And in the Zyprexa case, the court had issues with it there. Here, Your Honor, I think that actually Judge Rupp has made everybody, done everybody a service by simplifying this case to a quantity effect for only those prescriptions that were starting to be not written in the wake of the Nissen study. And then the second question I have is, every case you cite in support of the so-called natural experiment, the natural experiment included a regression or other expert analysis. And similar to what your opposing counsel says, don't you need one here, too? We don't need a regression analysis to be able to tease out the reasons why physicians stopped writing prescriptions for Avandia, knowing that there were serious ischemic risks that were now being posed. But don't you need a regression analysis to tell us how much, like what amount of the drop is attributable to the disclosure of the information? I understand you've got two experts who are going to say, we changed our prescribing habits, doctors changed their prescribing habits because of this information. But then what you're asking is for someone to determine, okay, for the 2005 to 2007 time period, there was clearly a huge drop in prescriptions. Why did that drop happen? Was that drop simply because of this information or something else? That is what we're trying to figure out if you need an expert for.  And the answer, we say the answer is we do not need an expert for that specific reason, because we have experts on all of the other medical issues that are there. There's an absence of any other logical explanation. We've got medical experts saying, of course, you're going to stop giving people this medication. It poses serious adverse events. So what is left for any expert to do? And frankly, if you even look at, there's an irony here, if I may, Your Honor, there's a real irony here. The reason that Dr. Rosenthal's regression was that the district court perceived that it needed to find it not reliable was because when Dr. Rosenthal looked and was doing a regression on this fact pattern, she observed that there was a dramatic change of the prescription writing in the middle of 2007. And as an econometrician, she decided, I have to have a structural break at that point in time to be able to change the way that you value the strength of the advertising being undertaken by GSK. In other words, you have to determine, you have to let the model tell us how important the advertising is before and after that time period. And she concluded that before that time period, it only depreciated 1%, but after that period, it depleted by over 40%. And the court was perceived that that was to be some kind of, it seemed result-oriented to her. But the reality was, in order to be able to do a regression when you have such a dramatic effect like this, is you have to modify the model in order to be able to have the regression undertake its usual work. Counselor, I want to just understand something you were saying about Dr. Rosenthal's analysis. You said something like the reason that there was, the discount that there was in her analysis had something to do with limitations regarding the earlier class period. I want you to just explain that to me. I want to understand a little bit more about what that tells me about her analysis regarding the 2005 to 2007 time period. Dr. Rosenthal's analysis. Sure. So when one undertakes an effort to figure out what effect does promotion have on sales, economists look at what they call the stock of promotion, meaning that they look at how much money is being spent on advertising and promotion. They keep on pouring that into a bucket as it occurs. That's the stock. And then that stock can't stay the same value the whole time through. Instead, you have to depreciate it, like you depreciate a house. OK, so normally- Counselor, counselor, I just want to let you know you talked over my two-minute warning. You're now, you're expired. So I'm going to let you answer Judge Montgomery's question. I'll see if Judge Ambrose has any. I might have some. I just wanted to give you the heads up. I'm sorry to interrupt. No, I appreciate that. But I do want to answer this question because I do think it's important. So you have to depreciate that stock over time. Now, in this case, we instructed Dr. Rosenthal to only, so for the time period in this case, Dr. Rosenthal had stock that would have started in 1999 and 2000, 2001, 2002, 2003, 2004. All of that added up and was only depreciating at a small rate, 1%. We instructed Dr. Rosenthal to not count that promotion as illegal. Leave it as legal promotion. Because we want to only have to prove to the jury that starting in January of 2005, that's when GSK should have been doing something, shouldn't have been doing all this promotion now that they really have the goods on ICT37. So Dr. Rosenthal instead only started the promotion in advertising stock in January of 2005 and ran that through to the middle of 2007. So you only have that stock that's counting. However, of course, the sales are occurring by reason of all the promotion during all of the time. So my point ultimately was the simple one then, Your Honor, which is that Dr. Rosenthal was only quantifying some of the promotion effect and not all of the promotion effect. And she certainly wasn't doing what now we're doing, which is we're looking at the effect of releasing a study like Nissen on the prescribing of Avandia to diabetics whose primary risk factor is cardiovascular disease. Thank you. Counselor, your adversary said the Nissen study is never mentioned in the class certification opinion. Do you think that means that Judge Roof was not considering the Nissen study as a relevant event? Judge Roof has been sitting on this case for 16 years. This case started because of the Nissen study. She's had to write about the Nissen study time and time again. The notion that Judge Roof had forgotten about the Nissen study when she sat down to write this class certification decision, having finished a class certification hearing, where it's pretty much all we talked about, is absurd. Let me pick up on that because on pages 25, 26, I think of your brief, and also I think on page 36, you wrote that the district court made a factual finding that whether the post-Nissen drop could serve as an actual experiment was a question of fact for the jury. But where in the district court's class certification opinion does it say that? I couldn't find it. It is not there, Your Honor. It is in the Darbert, Judge Roof's Darbert decision multiple times. She identifies the factual record supporting those two critical facts multiple times in her Darbert ruling. You will not find it in the class certification decision, Your Honor. Why is that? I think because she didn't have to. She had just written about the Darbert decision eight months earlier, and she said in her class certification decision, as a prelude to class certification, I did Darbert proceedings, and she referred to them. I don't think there's any reason that she should be criticized for not having done anything more. So, in effect, you're saying she bought into your, quote, natural experiment, close quote, argument. And particularly if you read the Darbert decisions, Your Honor, it's hook, line, and sinker. And then that comes back to my prior question. For example, a case that's quite similar to this, Sargent's Benevolent, Second Circuit said, you need something else.  And so, if we agree with that, you need something else, what would that something else be for you? It will be all of the facts that I just rattled off. And unlike in Sargent's, for instance, where Judge Livingston did two things. First, she made abundantly clear that that decision was limited to the facts in that case, and the facts in that case only. And then second, she went at length to point to parts of the record there, where there were other factors that would explain the decline, other than the disclosure of a mild safety risk. And she went through those in detail multiple times. But there, there was evidence of multiple brand drugs going generic. There's no evidence of that here. There was evidence. So, there are other things that she limited her ruling to. But, for example, in Sargent's Benevolent, you also had Dr. Rosenthal testifying. And Judge Livingston writes that she testified that the drop in sales was, quote, so precipitous that she had never seen anything like it, that even a drug's loss of patent protection generally did not cause such a slide in sales. And you don't have that stark of a case. So, how is this case different from Sargent's Benevolent again? So, in terms of the drop, Your Honor, in Sargent's and Ketech, because it was an anti-infective, it was a seasonal drug. And so, the decline that you saw there actually occurs in waves on the way down. It goes up and down, but the decrease is sort of like a decreasing wave. As opposed to here, you just have a complete drop. Dr. Rosenthal was addressing this case after she addressed the Ketech case. And in Ketech, Judge Livingston again said that there was only a mild, a relatively mild decrease that was happening there. Here, this really is completely, and again, our experts have testified about this, sorry to do this, have testified that this is a dramatic, an absolutely dramatic release and a dramatic decline. So, I'd like, I'm sorry, Judge Amber, go ahead. I was just wondering, if we were to, because we mentioned it to opposing counsel, if we were to remand for further fact-finding on Reliance, in your case, would you summarize again, would you produce other statistical evidence, or just rely on what currently was before the court, both in its certification opinion and its Daubert opinion, or would there be something else? Well, it would depend upon, of course, whether or not the court wanted to hear additional evidence, or whether we would be proceeding on the existence of the existing record. So, if I- If we said, I mean, we have said in prior opinions, when it goes back, you can, it's up to the discretion of the trial judge, whether to reopen discovery, but if so, make sure that both sides have an opportunity to do so. If we did that, would you, was there anything else you'd put in? Well, yes, I mean, we would, once again, take, frankly, we go through the regression part, you know, once again, but this time, time to make clear to the court that structural breaks are probably going to be needed in a regression like this because of the dramatic change you see in the sales that are occurring over time. And so, on the regression, you wouldn't be putting forth Dr. Rosenthal, you say you would be putting forth, I guess, McGuire, although right now it's only used for damages, Faruqi, and another doctor, is that correct? Dr. Perry. Dr. Perry. Yes, there are other experts also who talk about some other things we haven't gotten into, but yes, Dr. McGuire is an extremely accomplished econometrician, and Dr. McGuire would probably do a regression here, pointing to additional data sets. We'd probably also take more depositions of GSK to see, you know, what other theory do you have as to why it is that this drop went down? We'd probably just, you know, say, you know, put that to GSK to that test so that we can create a further record about the absence of an explanation, right? We'd probably do all of those things. Okay. Thank you. I have no further questions. We've been using, the words natural experiment have been used, and various of us have been kind of filling in the blanks. I'd like you just to define what that term means as you're using it in this case. Yeah, good question. Sure. What we mean is that if you see circumstances that occur in the real world that are highly analogous to the hypothetical one that you're seeking to use, then it is appropriate to use that natural experiment or yardstick, if you will. So, as an example, in the brand generic area, where in years later, you see that a generic, once it became available on the market, it took 63% of the market at that point in time, then it is quite common for economists and others to assume, using that natural experiment that had the generic been available earlier, you would also have seen a 63% decline. This kind of an analogy is usually so commonplace, it goes unchallenged in any way. And in all of the, for instance, the dozens of generic delay cases that have been out there in the United States, this notion of using a yardstick or a natural experiment to test something is commonplace. So, natural experiment is just substituting words for me. Are you saying to measure, to demonstrate the yardstick being what happened in the real world and doesn't match my hypo? Well, then you could fashion a hypo that matches the real world and it becomes a circle, no? Well, it doesn't become a circle. You've taken the real world dynamics and you've made clear that you're not going to go beyond those in what you're going to try to prove in terms of what would have happened if the wrongful conduct hadn't occurred. We're using it as a cap to cabin the loss. So, in this case, we know that there were still sales of this product during a period afterwards, or during that period, and there was also no prescriptions. You're not like Sargent's, because Sargent's was a, nothing would have been sold. That's exactly right. In other words, this case no longer is about why the doctors after Nissen continued to write prescriptions for Avandia. That's out of the case. The only question is, why did they stop? And the only explanation to the extent that they stopped is because of the release of Nissen, and that's the 63%. In other words, our case doesn't involve why doctors continued to write prescriptions. So, let me ask you one follow-up question on that. So, let's say I'm with you. Where does the jury hear the 63% number? Who tells the jury that? Dr. McGuire. Because he has the doctor. Does Dr. McGuire say anywhere? Sorry. I'm just adding on it. Not any other doctor like Perry or Faruqi. Dr. Perry and Faruqi, we plan to have them testify regarding the dramatic effect that's happening and why it's happening qualitatively, Your Honor, Judge Ambrose. But no, in terms of giving the percentage, that's simply Dr. McGuire taking a look at the actual math of what's going down and spreading it out over the period of time. So, that the percentage has changed like within every quarter or something like that. And does Dr. McGuire now say, Does it already do that? Yes. But does it do it for damages? Yes. I mean, does it do it beyond damages? Yes, he also does it for injury. In other words, he says, all right, this magnitude of the extent to which the sales are going down, 63% of them, when you're talking about 63% on 1.2 million prescriptions per month, results in all or substantially all third-party payers in the country paying for some amount less of Vandia. And does that number not rely on anything Rosenthal did? It does not rely upon anything that Dr. Rosenthal did. Okay. I'd like to just go back to causation versus correlation. Is it your position, given that there is no regression analysis, that the reason why this case differs from Sargent's, from UFCW, and therefore the absence of regression, is because here this record gives no other explanation. There've been briefs making statements, but the record evidence doesn't show it. Is that why this case is different from those cases in which regression was required? Or used, I should say. The answer to that is yes, but also because here we also have other expert testimony, the medical evidence, about the plausibility of that conclusion. In other words, again, these are diabetic patients for their highest risk is cardiovascular, and it's set against a setting where a Vandia has been sold as being safer for their hearts. And now you see this dramatic decline. You have like experts testifying about that, and the experts testifying about these things being the same. So yes, it's also the absence of any explanation too, but it's not like we're just saying, look at this and just, because there's no other explanation, just look at this chart. Instead, we're saying, no, look at all of the other circumstantial evidence that's out there, particularly the medical evidence. In any other case that's of this sort, where regression was not relied on as a basis to find predominance? Yes, this court, the Third Circuit in the Warfarin case, 2004, affirmed class certification on a situation where DuPont was alleged to have lied about the quality of a brand versus a generic to physicians. And as a result caused higher prices to be charged for the brand. And this court held that it was not an abuse of discretion for the district court to certify that class. Now that case admittedly was an antitrust case, but this court in Avandia One, analogized our case, Avandia, as having the closest parallel was to the Warfarin case. And so I really think that the strongest and the most compelling situation where this court has looked at the same issue here, because Warfarin by definition, required some assumption that physicians were relying upon these misrepresentations that were being made by DuPont. And the same thing is at issue here. So I would suggest that that's the case. Well, Danborough, any further questions of counsel? Nothing further at this time. The one thing, Judge Schwartz, I would ask it once we're done, if we could ask counsel to have a transcript prepared. But let me just see if Judge Montgomery has anything else for Mr. Sobel. No questions. Thank you. Okay, great. Counsel, thank you. Ms. Allen. Thank you, Your Honor. I wanna start with the suggestion that we're somehow saying that Judge Roof forgot about Nissen. We're not saying that at all. Judge Roof certainly heard about Nissen. She heard those arguments. It's not just that she didn't mention, forgot to mention Nissen in her decision. She considered it and rejected it. And she offered two other reasons for certifying a class, which we didn't even hear Mr. Sobel address because the plaintiffs aren't defending those bases. She gave an explanation for what she did. Now, we think that was legal error, but she rejected Nissen because they didn't have an expert to sponsor it. And she instead certified class based on two other types of common evidence. And we have litigated this case for years with plaintiffs saying to the court, they said, this is a class certification. They said, we have two ways to prove alliance. We have Dr. Rosenthal and her aggression. And we have this inference that all prescriptions were written in reliance on the fraud. Dr. Rosenthal got excluded under Daubert and the court accepted the second one, the inference that all prescriptions were written in reliance on the fraud. We think that's legal error. Now the plaintiffs are saying, well, we should have a third one. And the suggestion that they should get a redo after making strategic choices of their own volition, I think is fundamentally unfair to GSK. We litigated this case with Dr. Rosenthal. Her regression was flawed and it was excluded. We then litigated the question of a universal inference. And I think that that is flawed as well, but I don't think they should get a redo. I do also wanna address Mr. Sobel's suggestion here that he has experts who are gonna say, well, this drug was so dangerous and those experts are somehow gonna be part of the causation theory that they're gonna offer the jury. The problem is he has two problems. Number one, he's not pursuing a theory that Avandia is more dangerous than any other drug. And he's not pursuing it because the FDA conclusively determined, this is Joint Appendix 520, that Avandia is not more dangerous than any other comparator drug. Then why did the FDA ultimately require a black label? Your Honor, the FDA revoked the black label after the re-adjudication of the record trial. So they did require a black box warning after Nissen. They had some concerns. Record was re-adjudicated. And in 2014, they removed the black box warning because they concluded that the product was in fact not riskier. And so there is not a theory of the case. I mean, obviously it was still dangerous. We can debate how dangerous it was in terms of causing other issues beyond what it was supposed to be doing with respect to the diabetes. But in 2012, there were massive civil and criminal penalties here. Your Honor, I have to disagree with the first part of your statement, which is that we can debate how dangerous it was. The FDA concluded that with respect to cardiovascular risk, Avandia is not more dangerous. Well, focus on the second part. I think that was just an intro to get to the second part about what happened about the criminal issues. And civil liability. Yeah, so there were certainly settlements that related, by the way, to this drug and others. They were not all about Avandia. None of those were based on the theory the plaintiffs have here, which is a failure to disclose ICT 37. That's what the plaintiff's case is about. There was no suggestion in the plea that there was a failure to disclose ICT 37. In fact, the record shows that GSK promptly reported those results to the FDA, and the FDA said not to change the label. And so I think the reason the plaintiffs are saying this is because they're trying to fit in this exception where you have, Sargent's calls, the extraordinary case where the drug is so dangerous that no one would have prescribed it. That is affirmatively not the case here. And that's what Judge Roof recognized in the Daubert decision when she said that there were other reasons for doctors to prescribe Avandia having nothing to do with its cardiovascular profile. So that's refuted conclusively by the record here. I also wanted to briefly address the point about the natural experiment. So let me just respond. Judge Schwartz is trying to get a question in. I'm sorry. Yeah, I'll come back later. Go ahead. I want to make sure I understand. You said that Judge Roof rejected Nissan. But Judge Roof must have relied on Nissan to close the class period in 2007 at the point it was disclosed. So maybe I misunderstood you, but you said Judge Roof rejected Nissan because there was no expert, but she must have considered Nissan because she closed the class period in 2007. So can you just clarify what you mean by rejected because no expert? Yes, Your Honor. She rejected the Nissan theory as a theory of causation. The theory, the 63% as a theory of causation, she rejected that. The plaintiffs at the class certification hearing said, we don't need Dr. Rosenthal. It doesn't even matter if we get, you know, we want an inference that all prescriptions were written in reliance on the fraud. But just look at the 63%. That's what they argued to her. The same argument they're making to this court. Look at the 63%. That's our causation model. That's what she, I believe, she rejected when she said, I'm not going to allow you to use Dr. Maguire to show reliance. She was rejecting the use of Nissan as a causation theory. I'm not suggesting that she said Nissan can't be used for any other purpose. And we can debate whether Nissan is a good proxy for ICT 37, but she rejected it as a means of proving reliance in this case. And I think that goes to the point about the natural experiment, which is leaving aside that the antitrust cases, including Warfarin, none of them have a reliance element. And so they're not exactly on point to begin with. But even if Nissan is a good proxy for ICT 37, and yes, Judge Rufin heard Dalbert said, that's a jury question. But even if it is, it puts plaintiffs in the same situation that the plaintiffs and sergeants and Zyprexa were in. They had a disclosure in those cases. And then the question is, have they done the analysis to determine what percentage of the decline is due to the disclosure slash the fraud and other factors? And the plaintiffs haven't done that here. They want the court to say the whole decline is due to the fraud. And that's exactly what the Second Circuit has said they can't do. The Second Circuit rejected exactly that. And in Zyprexa, it was not the quote unquote all or nothing situation. The plaintiff in Zyprexa was making the same argument the plaintiffs are making here. Just look at the decline. And what the court said is, these decisions are nuanced. They're not unidimensional. There are lots of factors at play. And you need an analysis that isolates them. And there is evidence in this record that there are other factors at play. I would point the court to Joint Appendix 4273. It is from Dr. Rosenthal, where she said there are- Excluded, though. But she's excluded. We can't consider her. Well, Your Honor, her model was excluded under Daubert. But that doesn't mean there is not still record evidence that there were other factors at play. First of all, she had another qualitative opinion that was not excluded in Daubert. So I- Are you about to read from that? Or are you reading from the one that was excluded? Well, I'm reading from the discussion of why she built her regression the way she- From the excluded report? Well, Your Honor, yes. The regression was excluded. But I don't think that undermines the point that there are other factors at play. And- Would you be able to bring that up at trial? If it's excluded? Well, I don't think we would need to because the regression wouldn't be- You're relying on it now. Well, I'm relying on it now because it fundamentally contradicts the plaintiff's position, which is the whole 63% is because of the decline. But even- Let's put Dr. Rosenthal to the side for a second. The Second Circuit has told us that you can't just look at the entire decline unless you have a drug that is so dangerous that no doctor would have prescribed it, which we don't have here. And so we have exactly the same situation we had in those cases. And it's not just that there were lots of other factors that are in no way analogous here. Sargent's Benevolent points to some of the same factors, pricing of competitors, introduction of competitors, these population level factors that are affecting prescription decisions. Just like there were lots of reasons for doctors to prescribe Avandia in the first place, there were other reasons why doctors would have stopped prescribing Avandia after the Nissen study that had nothing to do with the fraud. And when we say isolate the fraud, that means tell us which is because of Nissen and which is because of something else. Counsel, let me ask you a question. Without pointing to anything that's been excluded, what's the best place for us to look in the record to see that there were other reasons for the drop? So I would point you, Your Honor, to the district court's finding at Joint Appendix 13, which is there is no factual basis for the assumption that physicians had no reason to prescribe Avandia had GSK been honest about the drug's true cardiac profile. So the district court recognized, based on the record here, this is Joint Appendix 2726, Joint Appendix 3212, that doctors consider many different factors when they make prescription decisions. They consider many different sources of information. They consider the patient's experience and they assign them lots of different weights in making prescription decisions. And general statement by the person who wrote those words as to what doctors do. But I think Judge Montgomery has asked you what shows it here that influenced the decision to no longer prescribe. That's just a general statement. So in other words, weren't there some of 100? There's some portion that ceased to prescribe because of the Nissen-Waller study. Isn't that correct? I'm not, I don't debate that. Yes, some doctors, I am sure, stopped prescribing because of Nissen. And some doctors stopped. Sorry, I couldn't tell if you were speaking, Judge Ambrose. No, no, no, you go ahead. I was not. And some doctors stopped prescribing for other reasons. We have testimony in the record from doctors who said that the cardio profile, that the cardio messaging had nothing to do with their prescription decisions. Well, that sort of doctor wouldn't necessarily have cared about Nissen if they weren't interested or had heard about the cardio profile in the first place. And so there is certainly evidence in this record that these sorts of prescription decisions are complex. They vary patient by patient and they are not unidimensional. The same, that same dynamic, that there are lots of reasons that doctors would start prescribing Avandia explains that there are lots of reasons why doctors would stop prescribing Avandia. And that's why it's not appropriate to just say, let's look at the whole decline and assume, and by the way, it is all or nothing. That entire decline, the TPPs want to say is a result of the alleged fraud and they have not made any effort to. Why isn't that a jury question? Well, because they don't get to go to a jury in the first place if they don't have any sort of common evidence. They don't have a quantification that isolates the alleged fraud here. My opening to this question was that weren't, wasn't there some portion? I mean, it sounds like a very significant portion of doctors who declined after the Nissen report came out in 07 to prescribe any further for Avandia. And you would say, OK, there's a, and there's a very significant portion that we're not affected by that. Isn't there a way for them to try to prove that it was a significant portion? There was injury with respect to that, those prescriptions, and therefore there's liability. So there are two reasons I think they can't do that, Your Honor. The sort of qualitative approach. It must have been some. I don't think that that isolates the impact of the fraud. If you're isolating the impact of the fraud, kind of by definition, you're saying this piece was due to the fraud and this piece was due to something else that requires quantification. More concretely, they chose to structure their injury and damages model around a numerical output. That 63%. They make this clear in their response of brief at page 29. And so they can't just go to a jury and say some prescriptions were caused by the fraud because that would not give them any predicate support for their injury and damages model, which are built off of 63%. Now they could have made another choice about how to pursue this case, but they didn't. And so if it's not 63%, they have no proof of injury and they have no proof of damages because those both stem directly from 63%. And so they need a number because of the way they chose to build their case and they can't use. We're in class certification, common evidence world, and your adversary has identified all evidence that would go to all of the payers. That is common. Whether that's a winner seems to be a question not for us to decide, but for either to be decided on summary judgment or before a jury. And I fear that we're forgetting kind of where we might be. So tell us why is this a classification question focused on whether there's a predominant issue that can be proven by common evidence? Your Honor, I think it's a predominance question because under hydrogen peroxide, this court does have to engage with the merits sufficient to determine if common questions will predominate. There is no question that if they don't have common evidence of reliance, common questions do not predominate. I think that's abundantly clear from the precedent from this circuit. And so if they haven't offered evidence that is at all probative of that question, it's a problem on the merits, but it's also a problem at class certification. They have no evidence common or otherwise. Zyprexa and Sargents were both class certification questions. And it came up at this stage because if their theory of causation lacks any probative value, then that is a problem at class certification. There's a case, two cases out of the first circuit, Selexa and Narotin. I know Narotin is not a class cert case, but there was an observation made that says, I'm going to roughly quote what the court in Selexa said. If fraudulent marketing is not expected to influence a doctor's decision, then the marketing choice is inexplicable. That's the court's language in those cases. Isn't that enough to get them to the predominance point? In under the narrow issue that's in front of us. Yeah, Your Honor, I don't think it is. So in Narotin, not the class context, but that plaintiffs there had a regression, right? They used a regression to isolate the causal effect and that was found to be sufficient. The issue of proof here is a problem because it's a class. It would also be a problem if it was one insurer as I mentioned before. So in Narotin, they had exactly what the plaintiffs here are missing, which is a regression that has survived Daubert. And so I think Narotin is very different. And then Your Honor's point, I think, which is why would you do promotion if it didn't affect sales? I mean, that it might be relevant, but that's not a causation opinion. It does not attempt to conclude a causal link between the theory of the case here, which is prescription messaging about the cardio profile and prescriptions being written. They need a causal link, not just a, well, you wouldn't do it otherwise. Well, that may show correlation. They may show that it's sensical, but it doesn't show causation. And I think that the Second Circuit cases are quite informative about the fact that where you are dealing with complicated decisions like prescription decisions that are nuanced, you have to isolate the impact of the fraud and you need some sort of analysis that does that, and the plaintiffs don't have that here. Thank you, Counselor. I'm going to ask my colleagues if they have any further questions. Judge Montgomery-Reeves? None for me. Judge Ambrow? And maybe it's just, I think it's a repeat of something I'd asked previously, and with a bit of an expansion. When I look at the First Circuit decisions in Nerottin and Selexa, and I look at the Second Circuit decisions in Zeprexa and Sargent's Benevolent, and then the Painter's, I call it, Takata decision of the Ninth Circuit, I see perhaps just a nascent consensus that in an action like this one, third-party payers may prove reliance with common evidence so long as it includes statistical evidence of causation, like a regression analysis or something else. And I thought you agreed with me on that. Am I wrong? No, I do agree with you, Your Honor. That's what's missing. I agree that a regression is an acceptable economic tool to isolate the impact of the fraud and prove causation because it controls for other variables. I think there's a separate question of if you have individualized rebuttal evidence, does that nonetheless defeat class certification? Let me put that to the side. But I absolutely agree. In Nerottin, they had a regression for one insurer, but that was found sufficient. In Takata, Painter's, they had a regression. The class was certified. The Ninth Circuit affirmed. In Zyprexa and in Sargent's Benevolent, there was no regression. Here, too, there is no regression. There was one. The plaintiffs had one. They had Dr. Rosenthal. She was their causation expert, but that model was excluded. And that leaves them with no common proof of reliance. Or if it's a remand, it leaves them with relying on Dr. McGuire and possibly others. Isn't that correct? Yeah, yes. And I think in that situation, we would daubert Dr. McGuire for some of the reasons I just articulated. We would say the analysis that you do, alleged analysis that just takes 63%, is not a regression. It does not isolate the impact of the fraud. And we would have filed a daubert on that basis. The court could have assessed it, but we didn't do that because Dr. McGuire wasn't offered for causation. They had Dr. Rosenthal for causation. And I think that they should live with the choices they made. This case has gone on quite some time and to go back and redo discovery so that they can have a second chance isn't even something that they asked for and I think would be prejudicial to GSK. Okay. Counsel, we thank you both for your really helpful arguments. You did a great job and so thank you. And as Judge Ambrose indicated, we'd ask you to arrange to get a transcript and if each side could just split the expense of getting that transcript for us, we'd appreciate it. We wish you safe travels and hope that spring comes soon. Thank you, Your Honor. Thank you both.